# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  _____

MSP RECOVERY CLAIMS, SERIES LLC,
a Delaware entity,

      Plaintiff,

v.

SANOFI-AVENTIS U.S. LLC.; SANOFI US
SERVICES INC.; CHATTEM,
INC.; SANOFI S.A.; PFIZER, INC.;
GLAXOSMITHKLINE, LLC;
GLAXOSMITHKLINE PLC; and
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC;

      Defendants.

_____/

## CLASS ACTION COMPLAINT FOR DAMAGES

MSP Recovery Claims, Series LLC ("MSPRC"), brings this class action on behalf of

similarly-situated third-party payors (the "Class Members") to recover payments unlawfully

induced by Defendants Sanofi-Aventis U.S. LLC; Sanofi US Services, Inc.; Sanofi S.A.

(collectively "Sanofi"); Chattem, Inc. ("Chattem"); Pfizer, Inc. ("Pfizer"); GlaxoSmithKline, plc

and GlaxoSmithKline LLC (collectively "Glaxo"); and Boehringer Ingelheim Pharmaceuticals,

Inc. ("Boehringer").[1]

---

[1] Certain healthcare benefit providers have assigned their recovery rights to plaintiff MSPRC.
MSPRC asserts those rights it has obtained through the assignments described more fully below.

## NATURE OF THE ACTION

1.      Zantac was one of the first global blockbuster drugs, reaching annual sales of $1 billion by 1987.[2] For more than a decade after its 1983 market debut, it was one of the all-time, best-selling prescription drugs. Even today, after the introduction of generic alternatives, Zantac still ranks among the top 100 best-selling prescription drugs in the United States, with more than 15,000,000 prescriptions written for Zantac in 2016 alone.[3]

2.      Recent revelations by independent researchers have uncovered what will likely go down as one of the gravest public-health frauds in modern times. Put simply, Zantac is a cancerous poison. When ingested, *every tablet* (and every dose), produces the toxic carcinogen *N*-nitrosodimethylamine ("NDMA") in the body. NDMA is a by-product or waste product of various industrial processes, including the manufacture of rocket fuel. NDMA's lone medical use is to cause cancer in animals for laboratory experimentation. NDMA became notorious as the poison of choice in two sensational murders in the U.S. and Germany.[4] Cigarette smoking in most public places in the United States has been banned, in part, because it produces NDMA,

---

[2] Richard Wright, M.D., *How Zantac Became the Best-Selling Drug in History*, 16(4) J. HEALTHCARE MARKETING 24 (Winter 1996).

[3] ClinCalc.com, *Ranitidine, ClinCalc DrugStats Database*, available at https://clincalc.com/DrugStats/Drugs/Ranitidine (last accessed Nov. 11, 2019).

[4] Chase Purdy, *A Common Blood-Pressure Medicine is Being Recalled Because of a Toxic Ingredient*, available at https://qz.com/1330936/the-fda-is-recalling-a-common-blood-pressure-drug-because-it-was-mixed-with-ndma/ (last accessed Nov. 11, 2019).

and animal studies have shown that "exposure to NDMA has caused tumors primarily of the liver, respiratory tract, kidney and blood vessels."[5]

3.      As if formation of NDMA in the body from Zantac use were not bad enough, once present in the body, NDMA further metabolizes into other known carcinogens, including formaldehyde. In short, Zantac is a cancerous poison that at all times was sold by Defendants that knew, or had reason to know, it was a cancerous poison. As a proximate result of Defendants' conduct, third-party payors paid billions of dollars for this cancerous poison. Plaintiffs bring this class action on behalf of all third-party payors who paid enormous sums of money to Defendants for a drug that forms a chemical which causes cancer and has no medical value except as a cancer-causing agent and poison.

4.      Starting in 1981, and continuing on until the present, the Defendants have been engaged in racketeering activity designed to further the sale of Zantac, both in prescription and over-the-counter forms. That racketeering activity involved uncountable instances of wire and mail fraud for the purposes of concealing the carcinogenic nature of ranitidine and Zantac. Each Defendant knew of this issue and took active steps to fraudulently conceal this risk from consumers, third-party payers, doctors, and the FDA. This lawsuit seeks to recover the economic harm caused by the Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") on third-party payors, who spent billions on purchasing Zantac—a product that, absent the fraud and racketeering committed by the Defendants, would never have been allowed on the market.

---

[5] U.S. ENVIRONMENTAL PROTECTION AGENCY, *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)*, available at https://www.epa.gov/sites/production/files/2014-03/documents/ffrrofactsheet_contaminant_ndma_january2014_final.pdf (last accessed Nov. 11, 2019).

5.      Additionally, this case seeks damages for violations of the warranty statutes of numerous states and violations of various state consumer protection statutes for third-party payers.

## INTRODUCTION

6.      Recently, the public has been inundated with reports of serious impurities in pharmaceutical drugs. In 2019 alone, the U.S. Food and Drug Administration announced the largest generic pharmaceutical recall in U.S. history, of blood pressure medications such as valsartan and other angiotensin receptor blockers ("ARB") that contained dangerous levels of NDMA.[6] The NDMA in valsartan resulted from unlawful manufacturing processes. This case challenges a deeper wrong, because NDMA is inherent in Zantac, even if it is perfectly manufactured.

7.      Since 1983, Zantac—the brand-name version of the generic drug ranitidine—has been used to treat gastrointestinal conditions such as acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease.[7] Before Zantac, the acid-reflux market was dominated by Tagamet. Glaxo (then Glaxo Holdings) was a relatively unknown British pharmaceutical company. Then came the development by John Bradshaw of Zantac and the ruthless promotion of the drug in the U.S. market, which was accomplished through a marketing alliance with Hoffman-La Roche. Under the arrangement, Zantac was sold under the Glaxo name and

---

[6] U.S. FOOD & DRUG ADMIN., *FDA announces voluntary recall of several medicines containing valsartan following detection of an impurity* (July 13, 2018), available at https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity (last accessed Nov. 11, 2019).

[7] *Ranitidine hydrochloride – Drug Summary*, PRESCRIBER'S DIGITAL REFERENCE, available at https://www.pdr.net/drug-summary/Zantac-150-and-300-Tablets-ranitidine-hydrochloride-241.3325 (last accessed Nov. 11, 2019).

Hoffman-La Roche received a royalty on sales. Hoffman-La Roche dispatched a salesforce of more than 1,000 people and captured 25% of the antiulcer market in just over six months. Within three years, sales of Zantac had surpassed Tagamet, and by 1989 accounted for 53% of the antiulcer market. Zantac catapulted Glaxo into a market-leading position as one of the largest pharmaceutical companies in the world.

8.      Glaxo and Hoffman-La Roche's unprecedented success was made possible through a fraudulent scheme conceived by Glaxo, which perpetrated and perpetuated the scheme along with Pfizer, Boehringer, and Sanofi, beginning with Zantac's U.S. debut in 1983. At all times that Defendants sold Zantac, each one knew or had reason to know that the drug had (and has) an inherent, unreasonably dangerous, cancer-causing defect. When ingested, Zantac produces high quantities of NDMA, a chemical the World Health Organization has described as "clearly carcinogenic."[8]

9.      The dangers of NDMA already were well-known when Glaxo and Hoffman-La Roche launched their aggressive marketing effort that made Zantac the best-selling drug in the world. So, too, were the risks that Zantac would create NDMA when ingested. At the time when Glaxo researchers were desperately looking for an alternative to Tagamet, existing scientific literature strongly suggesting that drugs like ranitidine, which contain a dimethylamine (DMA) group, are highly likely to form NDMA when combined with substances found in the body, such as nitrites. Glaxo knew of those studies and attempted to discredit and paper them over with its own flawed, pretextual studies, all in service of the main goal—to launch an all-out assault on

---

[8]  R.G. Liteplo, et al., *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, WORLD HEALTH ORGANIZATION (2002), available at https://www.who.int/ipcs/publications/cicad/en/cicad38.pdf.

the lucrative antiulcer market, take it over, and catapult Glaxo into the top ranks of the international pharmaceutical world.

10.     Even after Zantac made Glaxo billions of dollars, and even after Glaxo licensed Zantac for over-the-counter and prescription sales to the Defendants (who then dispatched their own marketing salesforces), the dangers of ranitidine remained. Specifically, several articles and studies dealt with the precise issue:

- In 1983, an article came out implicating the toxicity of ranitidine;[9]

- In 1987, Glaxo participated in a human study involving ranitidine, where Glaxo deliberately manipulated the study to prevent those involved from discovering that ranitidine breaks down in NDMA;[10]

- In 2011, a scientific study found that out of eight tested pharmaceuticals, "ranitidine showed the strongest potential to form N nitrosodimethylamine (NDMA)" when present in drinking water during chloramine disinfection, and noted that the amounts were "much higher" than those in prior studies;[11]

- In 2011, an article described ranitidine as "an important NDMA precursor;"[12]

- In 2014, an article observed that ranitidine and two other pharmaceuticals "are potent NDMA precursors;"[13]

---

[9] Silvio De Flora, Carlo Bennicelli, Anna Camoirano, and Patrizia Zanacchi, *Genotoxicity of nitrosated ranitidine*, CARCINOGENESIS, Vol. 4, No. 3, pp. 255-260 (1983).

[10] J Meyrick Thomas, JJ Misiewicz, AR Cook, MJ Hill, PLR Smith, CL Walters, JK Forster, LE Martin, and DF Woodings, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 28 GUT. at pp. 726-738 (1987).

[11] Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010).

[12] Julien Le Roux, et al., *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 944 (Mar. 26, 2011).

- In 2016, a peer-reviewed study published in the scientific journal CARCINOGENESIS "confirmed the production of *N*-nitrosodimethylamine (NDMA), a potent carcinogen, by nitrosation of ranitidine under stomach-relevant pH conditions in vitro . . . . ;"[14] and

- In 2018, an article noted that ranitidine has a high rate of NDMA formation.[15]

11.     Perhaps the most comprehensive study of Zantac recently presented is the work of independent research firms Valisure LLC and ValisureRX LLC (collectively "Valisure"). A few months ago, they revealed that they had "detected extremely high levels of NDMA in all lots [of ranitidine] tested, across multiple manufacturers of ranitidine products," including Zantac.[16]

12.     The tests conducted by Valisure show that "ranitidine can react with itself in standard analysis conditions . . . at high efficiency to produce NDMA at dangerous levels well in excess of the permissible daily intake limit for this probable carcinogen."[17] Valisure tests detected 2,511,469 ng of NDMA per 150 mg tablet of Zantac—more than 26,000 times greater than the amount that can be safely ingested daily.[18] When Valisure conducted tests with

---

[13] Yong Dong Liu, et al., *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVIRONMENTAL SCIENCE & TECHNOLOGY 8653 (June 26, 2014).

[14] Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of* N-*nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[15] Takeuchi H, Yamashita N, Nakada N, Tanaka H., *Removal Characteristics of N-Nitrosamines and Their Precursors by Pilot-Scale Integrated Membrane Systems for Water Reuse*, INT'L. J. ENVIRON. RES. PUBLIC HEALTH. (Sept. 7, 2018).

[16] Valisure Citizen Petition to FDA at 6 (Sept. 9, 2019), available at https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf ("Citizen Petition") (last accessed Nov. 11, 2019).

[17] *Id.* at 2.

[18] Citizen Petition at 6-7.

conditions simulating the human stomach, the amount of NDMA peaked at 304,500 ng per tablet—3,171 times more than the amount that can be safely ingested daily.[19]

13.     This staggering amount of NDMA is found in ***every tablet*** of Zantac. A typical consumer with peptic ulcer disease taking Zantac for a typical treatment period of eight weeks is exposed to more than 280,000,000 ng (0.28 grams) of NDMA. A consumer who takes a 150 mg maintenance dose of Zantac once daily is exposed to 889,000,000 ng (0.889 grams) of NDMA over the course of a year.

14.     Valisure notified the FDA of its findings by filing on September 13, 2019, a Citizen Petition. In addition, Valisure submitted a copy of its Citizen Petition to the World Health Organization ("WHO") and the International Agency for the Research of Cancer ("IARC") for inclusion in IARC Monographs on the Valuation of Carcinogenic Risks to Humans, and requested that ranitidine be classified as a human carcinogen.

15.     Valisure is an "online pharmacy currently licensed in 38 states and an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization."[20] Valisure is also registered with the Drug Enforcement Administration and the FDA. Valisure's tests show that "ranitidine can react with itself in standard analysis conditions . . . at high efficiency to produce NDMA at dangerous levels well in excess of the permissible daily intake limit for this probable carcinogen."[21]

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

16.     The FDA recently announced a permissible intake limit of 96 ng of NDMA per day.[22] But even this limit may be too high: A public health statement issued 30 years ago by the Agency for Toxic Substances and Disease Registry warned of the dangers posed by NDMA, noting, among other things, that "high level short-term and low level long-term exposures [to NDMA] caused non-cancerous liver damage and/or cancer in animals [and] also usually resulted in internal bleeding and death."[23]

17.     Valisure's testing—employing the FDA's gas chromatography/mass spectrometry ("GC/MS") protocol—detects 2,511,469 ng (or 2.5 mg.) of NDMA in a single 150 mg tablet of Zantac. Thus, the FDA protocol detects a quantity of NDMA in each Zantac tablet that is more than 26,000 times greater than the FDA's daily permissible NDMA intake levels. "The typical recommended dose of ranitidine for therapy of peptic ulcer disease in adults is 150 mg twice daily or 300 mg once nightly for 4 to 8 weeks, and maintenance doses of 150 mg once daily."[24]

18.     Moreover, chronic use (and overuse) of the drug is common "for therapy of heartburn and indigestion."[25] Thus, a typical user who is taking Zantac for eight weeks to treat peptic ulcer disease is exposed to more than 280,000,000 ng (or 0.28 grams) of NDMA based on the NDMA levels detected using the FDA's GC/MS test. And a consumer who takes a 150 mg maintenance dose of Zantac once daily is exposed to 889,000,000 ng (0.889 grams) of NDMA

---

[22] An ng (nanogram) is a very small unit of measurement. One milligram (1 mg.) is 1,000,000 ng.

[23] Agency for Toxic Substances & Disease Registry, *Public Health Statement for n-Nitrosodimethylamine* 2 (Dec. 1989), available at https://www.atsdr.cdc.gov/ToxProfiles/tp141-c1-b.pdf (last accessed Nov. 11, 2019).

[24] *Drug Record: Ranitidine*, NATIONAL INSTITUTES OF HEALTH (updated July 1, 2019), https://livertox.nih.gov/Ranitidine.htm (last accessed Nov. 11, 2019).

[25] Citizens Petition at 8.

annually. Again, the FDA's permissible intake limit of NDMA is 96 ng per day, which translates to just 0.000034 grams per year for consumers who take a daily 150 mg maintenance dose.

19.     Zantac is taken not only by adults but also is given to children and teenagers to treat gastroesophageal reflux disease, among other things. Further, Zantac often is used by pregnant women to treat pregnancy-related heartburn symptoms—exposing both the pregnant woman and her developing fetus to NDMA, which is not only carcinogenic and toxic, but also DNA-damaging.

20.     In addition to conducting the FDA-recommended testing described above, Valisure tested Zantac "in conditions simulating the human stomach," and detected quantities of NDMA as high as 304,500 ng per tablet—3,171 times more than the amount that can be safely ingested daily.[26] This is consistent with recent, peer-reviewed scientific literature, which has demonstrated the existence of dangerous levels of NDMA in the urine of those who have taken ranitidine.

21.     In addition to testing Zantac for NDMA, Valisure also tested several other alternative drugs to Zantac, to determine if they also contained NDMA. The drugs tested included Pepcid, Prilosec, Nexium, Prevacid, Protonix, AcipHex, and Dexilant. Valisure did not detect any NDMA in any of these drugs.[27]

---

[26] *Id.* at 7.

[27] *Id.* at 15-16.

22.     On September 13, 2019, when the news broke that Zantac exposed consumers to NDMA, "[g]lobal health regulators sounded a coordinated alarm."[28] In response, and as further set forth below, most countries have pulled Zantac and generic ranitidine from the market. In the U.S., many pharmacies and ranitidine manufacturers themselves (including Defendants GSK and Sanofi) have pulled Zantac from their shelves or recalled their ranitidine products.

23.     Unfortunately, thus far, the FDA has done very little to protect the American people from Zantac, and its messaging has been contradictory, confusing, and slow. Valisure first notified the FDA in June 2019 about the formation of NDMA from ranitidine. The FDA did nothing and made no public comments, even dismissive comments, on the issue.

24.     On September 13, 2019, the FDA issued its first statement acknowledging that Zantac contains NDMA but, in what appears to have been an attempt to downplay the risk, claimed the amount of NDMA detected was low, stating that "[t]he U.S. Food and Drug Administration has learned that some ranitidine medicines, including some products commonly known as the brand-name drug Zantac, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA) at low levels."[29]

---

[28] BLOOMBERG LAW, *Carcinogen in Zantac and Generics Triggers FDA, EU Probes (2)* (Sept. 13, 2019), available at https://news.bloomberglaw.com/health-law-and-business/fda-eu-probing-carcinogen-detected-in-versions-of-zantac-1 (last accessed Nov. 11, 2019).

[29] FDA, *Zantac (ranitidine): Safety Information - NDMA Found in Samples of Some Ranitidine Medicines*, available at https://www.fda.gov/safety/medical-product-safety-information/zantac-ranitidine-safety-information-ndma-found-samples-some-ranitidine-medicines (last accessed No. 11, 2019).

25.     Further, although numerous regulators outside the United States had cautioned those taking Zantac to consider an alternative, given the availability of many safe alternatives, on September 13th, the FDA told Americans they need not stop taking OTC Zantac.[30]

26.     Less than a month later, on October 2, 2019, in an apparent about-face to save face, the FDA stated that it had found "unacceptable levels of NDMA in samples of ranitidine," although it provided no details of when or how.[31] The FDA has not disclosed what those levels were, what tests it used, or any other information that might illuminate its findings and educate the public. It does seem, however, that the FDA is finally beginning to understand and admit the core fact at the heart of this complaint—when ingested, Zantac causes the body's formation of dangerous amounts of cancer-causing compounds. On October 24, 2019, an FDA spokesperson belatedly stated that the FDA is currently "working to understand what happens to NDMA levels in the body, after ranitidine has been exposed to acid in the stomach."[32]

27.     At all relevant times, all Defendants knew or had reason to know that Zantac exposes users to unsafe levels of the carcinogen NDMA. During the period in which Defendants manufactured and distributed Zantac, numerous scientific studies were published proving, among other things, that ranitidine (the generic bioequivalent of Zantac) forms NDMA when placed in drinking water, and persons who consume ranitidine have a 400-fold increase of NDMA

---

[30] *Id.*

[31] Eric Palmer, *FDA now says impurity level in Zantac and other antacids is too high*, FiercePharma.com (Oct. 2, 2019), available at https://www.fiercepharma.com/manufacturing/fda-now-says-impurity-level-zantac-and-other-antacids-too-high (last accessed Nov. 11, 2019).

[32] Michael Erman, *FDA investigating whether Zantac causes carcinogens to form in users*, REUTERS (Oct. 24, 2019), available at https://www.reuters.com/article/us-fda-heartburn-zantac/fda-investigating-whether-zantac-causes-carcinogens-to-form-in-users-idUSKBN1X32NA (last accessed Nov. 11, 2019).

concentration in their urine. Despite the weight of scientific evidence showing that Zantac exposes people who take it to unsafe levels of the carcinogen NDMA, no defendant ever disclosed this risk to the FDA, not on the drug's label, and not by any other means. Instead, Defendants put profits ahead of safety and aggressively marketed an inherently, unreasonably dangerous drug, reaping massive profits from exposing millions of people to cancer-causing chemicals. Those profits never would have been realized had the truth been known, because none of Plaintiff's assignors, nor any of the Class Members, would have paid for Zantac if they had known that ranitidine produces toxic NDMA in the body. Plaintiff and the Class bring this action to recover all sums they paid for Zantac.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1367.

29.     This Court also has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat 4 (codified in various sections of 28 U.S.C.).

30.     This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff (including class members) and the Defendants. 28 U.S.C. § 1332(d)(2).

31.     Under 28 U.S.C. § 1391 and 18 U.S.C. § 1965, venue is proper in the United States District Court for the Southern District of Florida because the claims alleged in this action accrued in this district and Defendants regularly transact their affairs in this district.

32.     This Court has personal jurisdiction over each of the Defendants because the Defendants conduct business in Florida, maintain and carry on continuous and systematic contacts with Florida and this judicial district, regularly transact business within Florida and this

judicial district, and regularly avail themselves of the benefits of their presence in Florida and this judicial district.

33.     All conditions precedent to this action have occurred, been performed, or been waived.

## THE PARTIES

### A.     Plaintiff

34.     MSP Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company with its principal place of business in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more specific Series. All records of all Series are maintained together with all assets of MSPRC. Connecticare, Inc., Fallon Community Health Plan, Inc., Summacare, Inc., Group Health Incorporated, and Health Insurance Plan of Greater New York (the "Assignors") have assigned their recovery rights to assert the claims alleged in this Complaint to Series 15-09-157, 17-04-631, 16-11-509, and 16-08-483 respectively, which are subseries of MSPRC. The Assignors have paid for Zantac (both branded and over-the-counter).

### B.     Defendants

#### *1.     Glaxo Defendants*

35.     Defendant GlaxoSmithKline plc is an English corporation and the successor-in-interest to the companies that developed, patented, and commercialized the molecule known as ranitidine. Ranitidine was initially developed by Allen & Hansburys Ltd.[33] Allen & Hansburys was acquired by Glaxo Labs Ltd. In 1958, and thus, when ranitidine was discovered in the late 1970s, Allen & Hansburys Ltd. was a subsidiary of Glaxo Labs Ltd. In December 1978, Allen &

---

[33] D. Lednicer, Chronicles of Drug Discovery, ACS PROFESSIONAL REFERENCE BOOK. pp. 45-81 (1993).

Hansburys Ltd. was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office, which covered the ranitidine molecule. Glaxo Labs (now GlaxoSmithKline plc) also conducted the clinical trials and other trials associated with the New Drug Application (NDA 18703) it submitted to the FDA for Zantac. In 1983, Glaxo Holdings Ltd. was awarded approval by the U.S. FDA to sell Zantac in the United States.

36.     Defendant GlaxoSmithKline LLC is a Delaware corporation with its principal place of business located at 5 Crescent Drive, Philadelphia, Pennsylvania, 19112 and Five Moore Drive, Research Triangle, North Carolina, 27709. GSK controlled the rights to prescription Zantac between 1983 and 2009 and either directly, or through a subsidiary, marketed prescription forms of Zantac in the United States.

37.     Defendants GlaxoSmithKline plc and GlaxoSmithKline LLC (collectively "Glaxo"), from 1983 through 1996, had exclusivity with respect to Zantac and were the sole manufacturer and seller of prescription forms of Zantac. After 1996, Glaxo also sold over-the-counter ("OTC") versions of Zantac and continue to sell the prescription versions of Zantac until recently.

### 2.     *Sanofi Defendants*

38.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly-owned subsidiary of the French company Sanofi, S.A.

39.     Defendant Sanofi US Services Inc. is a Delaware corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly-owned subsidiary of the French company Sanofi, S.A.

40.     Defendant Chattem, Inc., is a Tennessee corporation with a principal place of business at 1715 West 38th Street Chattanooga, Tennessee 37409, and is a wholly-owned subsidiary of the French company Sanofi, S.A.

41.     Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Chattem, Inc. (collectively "Sanofi") have controlled the U.S. rights to OTC Zantac from January 2017 to the present, and manufactured and distributed the drug in the United States during that period.

### 3.     *Boehringer*

42.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") is a Delaware corporation with a principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877, and is a subsidiary of the German company Boehringer Ingelheim Sohn AG & Ko. KG. Boehringer owned the U.S. rights to OTC Zantac from about October 2006 to January 2017, and manufactured and distributed the drug in the United States during that period.

### 4.     *Pfizer*

43.     Defendant Pfizer, Inc. is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017. From 1996 through 1999, Warner-Lambert Co. (now a Pfizer subsidiary), owned the rights to manufacture, market, and sell OTC Zantac, and Warner-Lambert manufactured, marketed, and sold OTC Zantac throughout the United States during that period. In or around 2000, Defendant Pfizer acquired Warner-Lambert, and Warner-Lambert merged into Pfizer. From 2000 through approximately 2005, Pfizer possessed the rights to manufacture, market, and sell OTC Zantac, and Pfizer manufactured, marketed and sold OTC Zantac throughout the United States during that period through its Consumer Healthcare division.

## FACTUAL ALLEGATIONS

**A.     Zantac's History**

>    *1.     Glaxo Has Known of the Ranitidine Dangers Both Before and After Zantac's Commercial Launch in 1981*

44.     Zantac/ranitidine belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.[34] Ranitidine was discovered in 1976 by the late John Bradshaw. Bradshaw discovered ranitidine while working as a chemist for Allen & Hansburys, which was acquired by Glaxo Labs Ltd. in 1958.[35] Glaxo specifically developed ranitidine to compete with the then-leading H2 blocker, cimetidine (Tagamet). At the time of its discovery and launch, Glaxo touted the safety and effectiveness of ranitidine over competing drugs like cimetidine.

45.     Bradshaw, and his co-inventors, Barry J. Price and John W. Clitherow, also of Allen & Hanburys, on July 25, 1977, applied for a ranitidine patent to the U.S. Patent and Trademark Office. The patent was granted on December 5, 1978, and Allen & Hanburys was issued patent No. 4,128,658.

46.     At the time that ranitidine was developed, the existing scientific literature already strongly suggested that drugs like ranitidine, which contain a dimethylamine (DMA) group, were highly likely to form NDMA when combined with other substances found in the body, such as nitrites. For example, a person taking Zantac likely would do so in connection with a meal. Many

---

[34] *Histamine H2 Antagonist (Oral Route, Injection Route, Intravenous Route)*, MAYO CLINIC, available at https://www.mayoclinic.org/drugs-supplements/histamine-h2- antagonistoral-route-injection-route-intravenous-route/description/drg-20068584 (last accessed Nov. 11, 2019).

[35] D. Lednicer, Chronicles of Drug Discovery, ACS PROFESSIONAL REFERENCE BOOK. pp. 45–81 (1993).

foods and meals contain nitrates in greater amounts than the body needs. Bacteria in saliva and the stomach, or enzymes in the body, can reduce the nitrates (NO3) found in food into nitrites (NO2). Additionally, some nitrites are found naturally in food or added as a preservative. Thus, at the time of ranitidine's discovery, Glaxo scientists knew or had reason to know that the very events that cause one to take Zantac also put a person at risk from NDMA.

47.    Further, in 1981, the year Zantac commercially launched outside of the US, two exchanges in *The Lancet*, one of which involved Glaxo, discussed the potential toxicity of cimetidine and ranitidine. Cimetidine, also an H2 blocker, has a similar chemical structure to ranitidine. *The Lancet* was and is one of the most widely read and respected medical and scientific publications, and thus, Glaxo (and the other Defendants) had actual knowledge of these discussions about ranitidine's toxicity in 1981.

48.    In one exchange, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, described how the researchers detected "mutagenic nitroso derivatives" in vitro for both cimetidine and ranitidine.[36] De Flora did recognize that his studies were in vitro, and that, as such, they were not perfectly predictive of how ranitidine would perform in humans. Glaxo's actual knowledge of this article at the time is proven by its specific response in *The Lancet*, which attempted to discredit de Flora's research. In its response, Glaxo cited its own, apparently flawed, recent study. Despite the flaws in its the study, Glaxo nonetheless admitted to having

---

[36] S. De Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, THE LANCET, pp. 993-994 (Oct. 31, 1981).

detected a "product" that was "mutagenic" in ranitidine, although it failed to clearly specify what that "product" was.[37]

49.     In a second set of articles in *The Lancet* around the same time as the de Flora article, medical researchers from England discussed a study they performed on 140 human patients taking cimetidine (the "Reed Study"). The Reed study observed that those who took cimetidine had a much higher level of N-nitrosamines than those in a control group who did not take cimetidine.[38] In response, Roger Brimblecombe, a researcher from Smith Kline and French Research, Ltd., criticized the Reed Study and claimed that unnamed "extensive studies" had demonstrated no "aetiological link between cimetidine treatment and the development of gastric cancer."[39]

50.     Importantly, Brimblecombe also stated that, "[t]he hypotheses raised by Reed and his colleagues are important and have been publicly and extensively discussed over the past two and half years. A great deal of research, both in our laboratories and in others, is in progress."[40] The formation of nitrosamines from cimetidine and ranitidine use was known to Glaxo and others at that time, and was a subject of much discussion in the scientific community.

51.     Dr. Reed responded to Brimblecombe on December 5, 1981, noting that, among other things, the studies Brimblecombe relied upon had been harshly criticized by others. Reed

---

[37] R.T. Brittain, D.M. Harris, L.E. Martin, D. Poynter, B.J. Price, *The Safety of Ranitidine*, THE LANCET, p. 1119 (Nov. 14, 1981). The article notes that these researchers are from "Glaxo Group Research Ltd." in England.

[38] P. I. Reed, K. Haines, P.L.R. Smith, F.R. House, C.L. Walters, *Effect of Cimetidine on Gastric Juice N-Nitrosamine Concentration*, THE LANCET (Sept. 12, 1981).

[39] Roger Brimblecombe, *Cimetidine, Nitrosation, and Carcinogenicity*, THE LANCET, pp. 686-687 (Sep. 26, 1981).

[40] *Id.*

also noted that "[d]ebate on N-nitroso compounds and human gastric cancer continues but some involvement seems likely . . . . If N-nitrosamine concentrations are raised in certain conditions with an increased risk of gastric cancer then this is a hint which must not be ignored."[41]

52.     Dr. Reed and his co-authors sounded the alarm on Zantac in 1981, but no one, including Glaxo, listened. In 1983, another study was published, this one specifically relating to ranitidine. Dr. Silvio de Flora (who had authored the 1981 piece in *The Lancet* that Glaxo sought to discredit), and a group of researchers from the University of Genoa published a study specifically describing the formation of N-nitrosamines from ranitidine and an excess of nitrite under certain conditions.[42] On information and belief, Glaxo and the other Defendants knew or had reason to know of this study.

53.     Further, another 1983 article specifically identified and discussed the toxicity of ranitidine. Another group of researchers from the University of Genoa demonstrated that in vitro, and under certain conditions, ranitidine has a tendency to form DNA-damaging nitroso compounds (like NDMA).[43] Although the study was performed on hamsters, and used conditions not necessarily identical to those found in the human body, it expressly issued a call for more research into the conditions in which nitroso compounds formed as a result of ranitidine ingestion. On information and belief, Glaxo and the other Defendants knew or had reason to know of this study.

---

[41] P. I. Reed, K. Haines, C.L. Walters, S.L.R. Smith, and F.R. House, *Cimetidine, Nitrosation, and Carcinogenicity*, THE LANCET, pp. 1281-1282 (Dec. 5, 1981).

[42] Silvio De Flora, Carlo Bennicelli, Anna Camoirano, and Patrizia Zanacchi, *Genotoxicity of nitrosated ranitidine*, CARCINOGENESIS, Vol. 4, No. 3, pp. 255-260 (1983).

[43] Annalisa Maura, Albiana Pino, Luigi Robbiano, Enrica Cajelli, Renata Finollo, Marco Cavanna and Giovanni Brambilla, DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells, TOXICOLOGY LETTERS, 18, 97-102 (1983).

54.     Further evidence of Glaxo's knowledge that Zantac formed NDMA in the body came from a human study Glaxo was involved in that was published in 1987.[44] In that study, researchers tracked 15 patients who took ranitidine and examined their gastric juices following their ingestion of Zantac. Critically, instead of using mass spectrometry—the gold standard assay at the time (which remains the case today)—to detect the presence of nitrosamines in the human subjects, Glaxo used a nitrogen-oxide assay, which essentially was designed *not* to find nitrosamines. Although the assay allegedly can detect N-nitrosamines, the sensitivity of the assay to detect NDMA is not established within the peer-reviewed literature. Even so, when the study team tested gastric fluid samples containing ranitidine, the nitrogen-oxide assay indicated the presence of N-nitroso compounds (for example, NDMA). Rather than exploring this further, the authors claimed these results were "fals[e]" and restricted all tests to "ranitidine free samples" in an obvious effort to avoid high readings of N-nitroso compounds.[45]

55.     Upon information and belief, these results were true, and in fact, were yet another warning sign to Glaxo scientists that ranitidine did and does generate carcinogenic N-nitroso compounds like NDMA. Scientists at Valisure have demonstrated that when ranitidine is incubated in simulated gastric fluid with nitrite, high levels of NDMA are formed. But rather than exploring this issue further, the 1987 study team simply did not test any study samples that had ranitidine in them.

56.     In fact, on information and belief, Glaxo never used a mass spectrometry assay to test for the presence of nitrosamines in this study, or in any of the studies and trials it did in

---

[44] J Meyrick Thomas, JJ Misiewicz, AR Cook, MJ Hill, PLR Smith, CL Walters, JK Forster, LE Martin, and DF Woodings, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 28 GUT. at pp. 726-738 (1987).

[45] *Id.*

connection with its ranitidine NDA. The self-evident reason is that using GC/MS (which requires heating of up to 130 degrees Celsius), causes excessive amounts of nitrosamines to be formed. If Glaxo used a GC/MS assay, which necessarily would have resulted in the formation of large amounts of NDMA, the FDA would never have approved Zantac as being safe.

### 2. *Zantac Becomes a Blockbuster*

57.     Zantac was approved for prescription use by the FDA in 1983. Due in large part to GSK's marketing strategy, Zantac was a tremendously successful drug, reaching $1 billion in total sales in December 1986.[46] As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . . enabled the product to dominate the acid/peptic marketplace."[47] Significantly, the marketing strategy that led to Zantac's success emphasized its purported safety.[48] Indeed, Zantac has been marketed ever since as a safe and effective treatment for adults, children, and infants.

58.   Zantac became available without a prescription in 1996, and generic versions of the drug (ranitidine) became available the following year. Although sales of brand-name Zantac declined "as a result of generic and alternative products,"[49] Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top ten antacid tablet brands in

---

[46] Richard Wright, M.D., *How Zantac Became the Best-Selling Drug in History*, 16(4) J. HEALTHCARE MARKETING 24 (Winter 1996).

[47] *Id.* at 27.

[48] *Id.* at 25.

[49] *GlaxoSmithKline –Product Portfolio*, PHARMACEUTICALS COMPANY ANALYSIS (Jan. 21, 2003).

the United States, with sales of Zantac 150 totaling \$128.9 million—a 3.1% increase from the previous year.[50]

59.     Over the past 20 years, the rights to Zantac in the U.S. have changed hands several times. Pfizer acquired the U.S. rights to OTC Zantac around June 2000 and manufactured and sold the drug in the United States, including in Florida, from August 2004 through December 2006.[51]

60.     Defendant Boehringer acquired the U.S. rights to OTC Zantac in late 2006, and manufactured and sold the drug in the United States, including in Florida, from approximately January 2007 to January 2017.[52]

61.     The Sanofi Defendants acquired the U.S. rights to OTC Zantac in approximately January 2017 and have since that time been manufacturing and selling the drug in the United States, including in Florida.[53]

62.     Defendant GlaxoSmithKline LLC, the original innovator of Zantac, retained the prescription rights to Zantac from 1983 through 2009.

---

[50] *Leading antacid tablet brands in the United States in 2018, based on sales*, STATISTA, https://www.statista.com/statistics/194544/leading-us-antacid-tablet-brands-in-2013-based-on-sales/ (last accessed Nov. 11, 2019).

[51] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021698s000_MedR.pdf.

[52] *See Digesting an acquisition: Patrick Hennig, Boehringer Ingelheim; Ingelheim Pharmaceuticals to acquire U.S. rights for Zantac product line; Interview*, DRUG STORE NEWS (Mar. 5, 2007); Mike Pare, *Chattem adds Zantac, Dulcolax to portfolio*, CHATTANOOGA TIMES FREE PRESS (TENNESSEE) (Feb. 8, 2017).

[53] *Id.*

### 3. Throughout the Relevant Period, the Defendants Falsely Represented that Zantac was Safe, While Knowing or Having Reason to Know of NDMA Formation From Ranitidine

63. As set forth above, even before Zantac's launch, and shortly thereafter, Glaxo knew or had reason to know, of NDMA formation from ranitidine. Specifically, ranitidine ingestion can lead to the formation of highly carcinogenic NDMA within the human body. As time went on, the scientific evidence establishing that NDMA is formed from ranitidine, in the body and in other conditions, continued to pile up.

64. For example, a 2011 study found that, out of eight observed pharmaceuticals, "ranitidine showed the strongest potential to form N nitrosodimethylamine (NDMA)" when present in drinking water during chloramine disinfection.[54] The same study noted that "[r]anitidine gave a much higher yield of NDMA in the present study than reported in [prior] literature."[55] On information and belief, Defendants knew or had reason to know of this study.

65. Another 2011 study that examined ranitidine in water supplies also found that the drug was "an important NDMA precursor."[56] On information and belief, Defendants knew or had reason to know of this study.

66. A 2014 study that examined the formation mechanisms of NDMA acknowledged the consensus about the dangers posed by ranitidine, observing that ranitidine and two other

---

[54] Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010).

[55] *Id.*

[56] Julien Le Roux, et al., *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 3164 (Mar. 26, 2011).

pharmaceuticals had "recently caused much concern because they are potent NDMA precursors."[57] On information and belief, Defendants knew or had reason to know of this study.

67.     A peer-reviewed study published in the scientific journal CARCINOGENESIS in 2016 "confirmed the production of N-nitrosodimethylamine (NDMA), a potent carcinogen, by nitrosation of ranitidine under stomach-relevant pH conditions in vitro" and also showed that, during the 24 hours following ranitidine intake, the quantity of NDMA in urine excreted by the patient "increased 400 folds from 110 to 47 600 ng."[58] The study noted that these levels of NDMA "equaled or exceeded those observed previously in patients with schistosomiasis, a disease wherein N nitrosamines are implicated as the etiological agents for bladder cancer."[59]

68.     The article also cautioned that these "estimates are conservative": The actual exposure to NDMA is "likely much higher than that eliminated in urine" since NDMA has "a high metabolic conversion rate," so that only about 0.05% of NDMA in the body is excreted in urine.[60] The study concluded that "a more comprehensive risk assessment"—such as "[e]pidemiological studies evaluating cancer risk, particularly bladder cancer, attributable to the long term use of ranitidine"—was needed, because of its "widespread use."[61]

---

[57] Yong Dong Liu, et al., *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVIRONMENTAL SCIENCE & TECHNOLOGY 8653 (June 26, 2014).

[58] Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[59] *Id.*

[60] *Id.* at 632.

[61] *Id*. at 632-33.

69.     The 2014 study also noted that "alternative medications, such as proton pump inhibitors (PPIs), would less likely promote in vivo nitrosation because of the lack of amines in their structure."[62] On information and belief, Defendants knew or had reason to know of this study.

70.     A 2018 scientific review "summariz[ing] major findings over the last decade related to N Nitrosodimethylamine (NDMA)," again pointed out that ranitidine had a high rate of NDMA formation "upon chloramination."[63] On information and belief, Defendants knew or had reason to know of this study.

71.     In addition to a significant amount of scientific literature continuing to demonstrate NDMA formation from ranitidine, there were studies published that specifically linked Zantac to certain cancers in humans. For example, in 2004 an extensive epidemiology study specifically linked Zantac use to bladder cancer.[64] In that study, nearly 51,000 health professionals (including dentists, veterinarians, pharmacists) were studied for nearly 15 years to assess the relationship between peptic ulcer disease and bladder cancer. As part of that study, the study participants' use of H2 blockers (which included both cimetidine and Zantac), were monitored. The study's authors noted that for those participants who took either cimetidine or

---

[62] *Id.*

[63] Takeuchi H, Yamashita N, Nakada N, Tanaka H., *Removal Characteristics of N-Nitrosamines and Their Precursors by Pilot-Scale Integrated Membrane Systems for Water Reuse*, INT'L. J. ENVIRON. RES. PUBLIC HEALTH. (Sept. 7, 2018).

[64] Dominque S. Michaud, Pauline A. Mysliwiec, Walid Aldoori, Walter C. Willet, and Edward Giovannucci, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, CANCER EPEDIMIOLOGY, BIOMARKERS & PREVENTION, Vol. 13 250-254 (Feb. 2004).

Zantac, "[w]e observed an increase in bladder cancer risk among men who reported taking either of these medications . . . ."[65]

72.     Despite the indisputable scientific evidence linking ranitidine to the production of high levels of NDMA, and mounting evidence that Zantac use is linked to cancer, Defendants never blinked, continuing to market the drug as if it were safe, and never disclosing these risks to consumers on Zantac's label or through any other means. In the 35-plus years that Zantac has been commercially available in the United States, the FDA has never been presented with any disclosure by any Defendant concerning the risk of NDMA formation from ranitidine. One reasonably expects that, if any such disclosure had been provided, the FDA would not have approved, or would have withdrawn its approval.

**B.     The Dangers of N-Nitrosodimenthylamine (NDMA)**

73.     "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes. It is a member of N-nitrosamines, a family of potent carcinogens."[66]

74.     According to a publication from the National Institute of Health, "[NDMA] is a volatile, combustible, yellow, oily liquid nitrosamine with a faint characteristic odor that decomposes when exposed to light and emits toxic fumes of nitrogen oxides when heated to decomposition. NDMA is primarily used in laboratory research to induce tumors in experimental animals. This substance may be formed during the cooking of foods, especially cured meats and fish, that contain sodium nitrite as a preservative, but is also found in several vegetables, cheeses,

---

[65] *Id.* at 252.

[66] *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)*, ENVIRONMENTAL PROTECTION AGENCY (Jan. 2014), https://www.epa.gov/sites/production/files/2014-03/documents/ffrrofactsheet_contaminant_ndma_january2014_final.pdf (last accessed Nov. 11, 2019).

alcoholic beverages and fruits, and as a contaminant in rubber products. Exposure to [NDMA] irritates the skin and eyes and damages the liver. This substance is reasonably anticipated to be a human carcinogen."[67] NDMA is used to cause cancer in rats for cancer research.[68]

75.     The dangers that NDMA poses to human health have long been recognized. A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[69] The WHO similarly reported in 2002 that: "NDMA has been consistently potently carcinogenic in all experimental species examined."[70] As a result, the WHO has recognized that "NDMA is clearly carcinogenic. There is overwhelming evidence that NDMA is mutagenic and clastogenic."[71] NDMA is no longer produced or commercially used in the United States, except for research.[72] It is a poison whose only medical use is as a carcinogen.

---

[67] https://pubchem.ncbi.nlm.nih.gov/compound/N-Nitrosodimethylamine (last accessed Nov. 11, 2019).

[68] https://cancerres.aacrjournals.org/content/canres/51/23_Part_2/6452.full.pdf (last accessed Nov. 19, 2019).

[69] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); S.A. Kyrtopoulos, *DNA adducts in humans after exposure to methylating agents*, 405 MUTATION RESEARCH 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumours of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

[70] Liteplo, RG, Meek ME and Windle W. *N-Nitrosodimethylamine. Concise International Chemical Assessment Document 38,* World Health Organization, Geneva (2002), *available at* https://www.who.int/ipcs/publications/cicad/en/cicad38.pdf.

[71] *Id.*

[72] *Technical Fact Sheet*, *supra* note 66.

76.     The IARC of the WHO classifies NDMA as one of 66 agents that are "probably carcinogenic to humans" (Classification 2A). The U.S. Environmental Protection Agency ("EPA") also classified NDMA as a probable human carcinogen by giving it a "B2" rating, which means that is "probably carcinogenic to humans."[73] The WHO has stated that scientific testing indicates that "NDMA consumption is positively associated with either gastric or colorectal cancer" and "suggests that humans may be especially sensitive to the carcinogenicity of NDMA."[74] The FDA also recognizes the danger of such compounds, setting strict daily acceptable intake limits of NDMA in pharmaceuticals of 96 ng.[75]

77.     As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.[76]

78.     Recently, beginning in the summer of 2018, the FDA has recalled several generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and irbesartan—because the medications "contain[ed] nitrosamine impurities that don't meet the [FDA's] safety

---

[73] WHO, *Guidelines for Drinking-Water Quality*, available at https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf (last accessed Nov. 11, 2019).

[74] *Id.*

[75] FDA updates table of interim limits for nitrosamine impurities in ARBs (February 28, 2019). *US Food and Drug Administration, available at* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (last accessed Nov. 11, 2019).

[76] *See, e.g.,* Karen De Witt, *Carcinogen Fear Allayed*, THE NEW YORK TIMES (July 2, 1980) (reporting recall of beer that contained higher level of nitrosamines than that permitted by FDA).

standards,"[77] which again provide that the intake of NDMA in pharmaceuticals should be no more than 96 ng.

79.     Unlike valsartan, the high levels of NDMA produced by Zantac are not a contamination problem, but a problem inherent to the molecular structure of ranitidine, the active ingredient in Zantac. In the chemical environment of the human stomach, the ranitidine molecule degrades into the known carcinogen, NDMA: "The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form DMA."[78] Thus, ranitidine produces NDMA by "react[ing] with itself,"[79] which means that *every dosage and form of ranitidine*, including Zantac, exposes users to NDMA.[80]

80.     NDMA in and of itself is toxic. But, NDMA is not the final harmful metabolite produced from ranitidine. NDMA itself is further metabolized by the body into other harmful compounds. For example, it is well-established that NDMA is metabolized by the body into formaldehyde. Formaldehyde is a known carcinogen.[81] IARC classifies something as a known carcinogen when "there is sufficient evidence of carcinogenicity in humans."[82] In addition to

---

[77] *Recalls of Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan*, FDA (May 23, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/recalls-angiotensin-iireceptor-blockers-arbs-including-valsartan-losartan-and-irbesartan.

[78] Citizen Petition, at 19.

[79] *Id.* at 2.

[80] *Id.* at 1, 6.

[81] https://www.cancer.org/cancer/cancer-causes/formaldehyde.html (last accessed Nov. 11, 2019).

[82] https://monographs.iarc.fr/wp-content/uploads/2019/07/Preamble-2019.pdf, at p. 35 (last accessed Nov. 11, 2019).

IARC's designation of formaldehyde as a known carcinogen, the United States itself has designated formaldehyde as a known carcinogen. In 2014, The National Toxicology Program, a division of the U.S. Department of Health and Human Services, classified formaldehyde as a known human carcinogen.[83] Formaldehyde has been specifically linked to various types of cancers. In 2009, IARC stated that "there is sufficient evidence for a causal association of formaldehyde with leukemia."[84]

81.     At all times relevant to this complaint, there was never any debate about the toxicity and lethality of NDMA. However, at one time, long ago, much of the literature linking NDMA to cancers, were based on animal studies. And, such studies linked NDMA to carcinogenesis and other adverse health consequences. In one example referenced above, a news article published in 1979 (four years prior to Zantac's U.S. launch), noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[85]

82.     More recently, there have been several important studies, including extensive epidemiological studies, which found that NDMA is a causal agent in various types of cancers. For example, one epidemiology study published very recently (in 2019), followed more than 30,000 persons who were exposed to NDMA for more than 40 years. The study found strong links between NDMA exposure and cancer in humans. Just as there was never any debate about how toxic NDMA is, there is now no debate about its causal connection to cancer in humans.

---

[83] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet#r3 (last accessed Nov. 11, 2019).

[84] https://www.atsdr.cdc.gov/toxprofiles/formaldehyde_addendum.pdf, at p. 47 (last accessed Nov. 11, 2019).

[85] Brody, *supra* note 69.

83.     Further, it is also true that nitrosamines like NDMA are found in certain foods in very low amounts. For example, in the FDA's September 13, 2019 release first announcing that it detected NDMA in ranitidine it tested, it stated, "NDMA is a known environmental contaminant and found in water and foods, including meats, dairy products, and vegetables."[86]

84.     However, the levels of NDMA formed in the human body as a result of ranitidine ingestion far exceed the levels of NDMA that ever could be found in food, making NDMA levels in food an inapt comparison to ranitidine. For example, as set forth above, in 2016, Professors Mitch and Zeng found that in the 24-hour period following ingestion of a single 150 mg tablet of Zantac, an individual can excrete nearly 47,000 ng of NDMA. For comparison, the United States Department of Agriculture ("USDA") has found that cooked cured bacon—commonly thought to be a food with a high level of nitrosomines—has, on average of 0.53 ng of NDMA per gram.[87]

85.     This means that to be exposed to the same level of NDMA that Mitch and Zeng measured (that is, 47,000 ng) following ingestion of a single 150 mg ranitidine tablet, a person would have to consume *more than 178 pounds of bacon within 24 hours*. This would, of course, be impossible – as other, more acute, health concerns would be experienced by anyone attempting to eat that amount of food in such a short time.

86.     The Mitch and Zeng study, however, as pointed out above, underestimated the level of NDMA exposure experienced by patients in the study—the authors state that only

---

[86] FDA, *Statement alerting patients and healthcare professionals of NDMA found in samples of ranitidine* (Sept. 3, 2019), available at https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine (last accessed Nov. 11, 2019).

[87] *See* https://www.fsis.usda.gov/wps/wcm/connect/25a03ca6-cdce-4e56-bfca-b634cc7abbef/nitrosamine-risk-assessment.pdf?MOD=AJPERES at Table 2.

approximately 0.05% of NDMA is excreted through urine, with this being metabolized into other compounds. Thus, one would have to eat thousands of pounds of bacon to reach the same levels of NDMA exposure found in one Zantac tablet.

## C. Defendants Fraudulently Misrepresented the Safety of Zantac in the Face of Studies Showing Otherwise

87.     During the time that Defendants manufactured and sold prescription and over-the-counter Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA. At no time did any Defendant ever disclose this risk to consumers on the drug's label, or through any other means, nor did Defendants report these risks to the FDA. Further, no Defendant presented to the FDA a proposed label disclosing the risks of NDMA formation from taking Zantac.

88.     In fact, Sanofi, along with its subsidiary Chattem, hosts a website (stating it is for "U.S. Residents Only"), where one of the "Frequently Asked Questions," is: "Is it safe to use Zantac on a daily basis?"[88] The answer is: "You may take up to two (2) Zantac tablets a day."[89] Sanofi has not taken down this link despite recalling all of its Zantac product in the United States.

89.     Sanofi also states on its website that Zantac "has the active ingredient ranitidine, which doctors have prescribed for years to treat millions of patients safely and effectively."[90] This website can also be accessed from Boehringer's website, where it continues to promote

---

[88] https://www.zantacotc.com/heartburn-relief.html (last accessed Nov. 11, 2019).

[89] *Id.*

[90] *Id.*

Zantac as a "trusted name in heartburn relief."[91] Boehringer hosted the same website during the period that it held the rights to sell Zantac.

90.     In addition to these representations, each package of Zantac contained an FDA-approved label. By using an FDA-approved label, the Defendants made representations to consumers and healthcare insurers (including Plaintiff's assignors and the Class Members), as well as express and implied warranties, of the drug's safety. Defendants knew, or had reason to know, that these representations were false.

**D.     Most Global Regulators, and Manufacturers Themselves, have Recalled their Zantac and Ranitidine Products**

91.     Since the filing of the Valisure's Citizen Petition on September 13, 2019, virtually every health regulator throughout the world, with the exception of the FDA, has taken steps to remove Zantac and ranitidine from the marketplace. In addition, many manufacturers, including the Glaxo and Sanofi Defendants, have also recalled the drug.

92.     At the request of Health Canada, the department of the Canadian government responsible for national public health, "companies marketing ranitidine products in Canada have stopped any further distribution until evidence is provided to demonstrate that they do not contain NDMA above acceptable levels."[92] According to Canadian regulators, "[c]urrent evidence suggests that NDMA may be present in ranitidine, regardless of the manufacturer."[93]

---

[91] https://www.boehringer-ingelheim.us/press-release/zantac-launches-innovative-integrated-marketing-campaign-educate-consumers-heartburn (last accessed Nov. 11, 2019).

[92] Health Canada, *Ranbaxy Pharmaceuticals Canada Inc. recalls prescription ranitidine products as a precaution; request to stop distribution remains in place while Health Canada continues to assess NDMA* (Sept. 25, 2019), available at https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2019/71029a-eng.php (last accessed Nov. 11, 2019).

[93] *Id.*

93.     Similarly, South Korea's Ministry of Food and Drug Safety has stated that "[i]t suspects NDMA may have been unintentionally produced in the course of natural decomposition and synthesis reactions of the nitrite and dimethylamine chemicals in ranitidine or by dimethylamine accidentally being added during the manufacturing process."[94]

94.     Germany, Switzerland, and Austria all have initiated recalls of ranitidine-based drugs, and Finland has withdrawn drugs containing ranitidine from its pharmacies. Singapore has suspended the sale and supply of several brands of ranitidine.

95.     Qatar's Ministry of Public Health "has withdrawn samples of ranitidine, including the one commercially known as Zantac, from public and private pharmacies" and has "recommend[ed] patients who use these drugs to review and consult their doctor, and those who use them without a prescription should use other alternatives."[95]

96.     In addition to these countries, the following countries have either issued recalls, medical alerts, announced an investigation, or companies voluntarily recalled their Zantac or generic ranitidine, or both:

- Australia
- Bangladesh
- Bahrain
- Cyprus
- Denmark
- Egypt
- France
- Greece
- Hong Kong

---

[94] Seo Jeong-won, Kim Hyo-jin, *Korea bans sales of Zantac and other ranitidine drugs after carcinogen alert* (Sept. 26, 2019), available at https://pulsenews.co.kr/view.php?year=2019&no=769561 (last accessed Nov. 11, 2019).

[95] Qatar Tribune, *MoPH recalls 'Zantac' as precautionary measure* (Sept. 16, 2019), available at https://www.pressreader.com/qatar/qatar-tribune/20190916/281492163020429 (last accessed Nov. 11, 2019).

- India
- Ireland
- Jamaica
- Kenya
- Kuwait
- Italy
- Japan
- Libya
- Lithuania
- Morocco
- New Zealand
- Namibia
- Norway
- Oman
- Palestine
- Pakistan
- Saudi Arabia
- South Africa
- Suriname
- Taiwan
- Trinidad and Tobago
- UAE
- UK
- Vietnam

97.    Some companies that manufacture and distribute Zantac and generic ranitidine

have also taken steps to protect consumers. Most recently, on October 18, 2019, Zantac's current

manufacturer, Defendant Sanofi, issued a recall of its Zantac in the U.S. and Canada.

98.    In its release announcing the recall, Sanofi stated that "[d]ue to inconsistencies in

preliminary test results of the active ingredient used in the U.S. and Canadian products, Sanofi

has made the decision to conduct the voluntary recall in the U.S. and Canada as the investigation

continues."[96]

---

[96] https://www.usatoday.com/story/news/health/2019/10/18/sanofi-recalls-heartburn-drug-zantac-investigate-carcinogen/4021833002/ (last accessed Nov. 11, 2019).

99.     On October 9, 2019, Defendant Glaxo announced that it was pulling its Zantac product from the marketplace worldwide. Sandoz, a unit of Novartis AG, has stopped its "worldwide distribution of generic versions" of Zantac.[97]

100.     And Dr. Reddy's Laboratories Limited has suspended its supply of generic Zantac (ranitidine) worldwide.[98] Other large pharmacies in the U.S. have also pulled Zantac and generic equivalents from their shelves. On September 30, 2019, pharmacy giants CVS, Walgreens, and Rite-Aid announced they were pulling Zantac and generic ranitidine from their shelves.[99]

101.     Walmart also announced that it was pulling the drug from its shelves.

102.     Reading this complaint, one might reasonably wonder how this ever could have happened. Why was this drug, which has been taken by millions, allowed to be sold? The answer is that the United States drug regulatory system is largely, if not entirely, reliant on the drug manufacturers themselves to perform adequate testing and report adverse events. Defendants concealed the Zantac-NDMA link from consumers in part by not reporting it to the FDA, which relied on them to bring new information about Zantac to the agency's attention.

103.     Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety.

---

[97] Anna Edney, *Carcinogen Scare Sets Off Global Race to Contain Tainted Zantac*, BLOOMBERG (Sept. 18, 2019), available at https://www.bloomberg.com/news/articles/2019-09-18/sandoz-halts-distribution-of-zantac-after-carcinogen-concerns (last accessed Nov. 11, 2019).

[98] *Dr Reddy tumbles on buzz of halting worldwide supply of Ranitidine*, BUSINESS STANDARD (Sept. 23, 2019), available at https://www.business-standard.com/article/news-cm/dr-reddy-tumbles-on-buzz-of-halting-worldwide-supply-of-ranitidine-119092300347_1.html (last accessed Nov. 11, 2019).

[99] https://www.washingtonpost.com/health/2019/09/30/drugstores-are-pulling-zantac-like-heartburn-drugs-off-shelves-over-potential-cancer-risk/ (last accessed Nov. 11, 2019).

The report is required to contain "[a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product."[100] The report also is required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.[101]

104.   The manufacturer's annual report also must contain "[c]opies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product."[102]

105.   Defendants simply ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac. Further, the FDA simply doesn't have the resources to police and enforce this provision. Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

## THE REPRESENTATIVE ASSIGNMENT AGREEMENTS

106.   Certain series of MSPRC have executed irrevocable assignments of any and all rights to recover payments made on behalf of their assignors' health plan members and enrollees. These assignments authorize the series and, in turn MSPRC through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and

---

[100] 21 C.F.R. §314.81(b)(2).

[101] *Id.*

[102] *Id.*

Medicare benefits. For example, and only to serve to further demonstrate standing, MSPRC alleges a few of the assignments below as examples.

107.    On March 20, 2018, Group Health Incorporated and Health Insurance Plan of Greater New York (otherwise known as "EmblemHealth" or "Emblem"), irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to Series 16-08-483, a designated series of MSPRC. Specifically, the assignments, attached as **Composite Exhibit A**, state the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

Comp. Ex. A, at 2, 4.

108.    On May 12, 2017, Summacare, Inc. ("Summacare"), irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC ("MSP Recovery"). Specifically, the assignment, attached as **Exhibit B**, provides the following language:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Summacare's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [Summacare] that [Summacare] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary

payers and/or third parties that may be liable to [Summacare] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".

Ex. B, at 1-2.

109.    On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under

the Summacare Assignment to Series 16-11-509, a designated series of Plaintiff:

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP Recovery] . . . .

**Exhibit C**, at 1. Summacare consented to, acknowledged, approved, and ratified the assignment

from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5,

2018, and attached as **Exhibit D**

110.    On March 20, 2018, Connecticare, Inc. ("Connecticare"), irrevocably assigned all

its rights and claims to recovery against any liable entity (including Defendants) for payments

made on behalf of its enrollees under Medicare Parts A, B, and D to Series 15-09-157, a

designated series of MSPRC.  Specifically, the assignment, attached as **Exhibit E**, provides the

following language:

Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

Ex. E, at 2.

111.    On June 19, 2017, Fallon Community Health ("FCHP"), irrevocably assigned all its rights and claims to recover against any liable entity (including Defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC. Specifically, the assignment, attached as **Exhibit F**, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

Ex. F, at 8.

112.    On June 20, 2017, MSP Recovery irrevocably assigned all rights acquired under the FCHP Assignment to Series 17-04-631, LLC, a designated series of Plaintiff:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [FCHP] and [MSP Recovery, LLC] . . .

Ex. G, at 1.

## PLAINTIFF'S ASSIGNORS PAID FOR ZANTAC

113.    Since 1983, Defendants have manufactured and distributed Zantac throughout the United States, for which Plaintiffs and Class Members have paid billions of dollars.

114.    For example, and only to further demonstrate standing, Plaintiff alleges some illustrative payments made by its assignors for the Zantac in the table below. Plaintiffs' assignors made payments for both prescription Zantac and OTC Zantac. In each instance, one of Plaintiff's assignors accepted coverage and paid the amounts indicated for cancer-causing Zantac. To be

clear, the table below does not demonstrate all of Plaintiff's assignors' payments for the

dangerous Zantac, let alone all of Plaintiff's damages.

| Assignor | Assignor's Enrollee[103] | Date of Service |
|----------|--------------------------|-----------------|
| Emblem | I.G. | 2/2/12 |
| Emblem | L.W. | 1/31/12 |
| Summacare | C.C. | 6/13/11 |
| Summacare | C.C. | 7/11/11 |
| Connecticare | E.O. | 7/5/16 |
| Connecticare | E.G. | 1/6/12 |
| FCHP | C.P. | 12/21/17 |
| FCHP | E.B. | 11/1/13 |

## CLASS REPRESENTATION ALLEGATIONS

115.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this class

action on its own behalf and on behalf of all Class Members nationwide. Plaintiff seeks class

certification of the claims alleged in this action and judgment for damages against the

Defendants for itself and on behalf of the Class.

116.    The Class is defined as follows, and consists of:

**Nationwide Class as to all Counts**

All third-party payers who paid for Zantac (the "Class"). Excluded from the Class
are: the Defendants; any parent, subsidiary, or affiliate of the Defendants; any
entity in which any of the Defendants have or had a controlling interest, or which
any of the Defendants otherwise controls or controlled; and any officer, directors,

---

[103] To ensure that this complaint complies with federal law under the Health Insurance
Portability and Accountability Act ("HIPAA"), the individual enrollees are referred to by their
initials.

employee, legal representative, predecessor, successor, or assign of any of the Defendants.

117.    In the alternative, Plaintiff alleges sub-classes for all third-party payors in each State, territory or possession—or combination(s) of States, territories, or possessions to the extent these jurisdictions' applicable laws are substantially similar and can be grouped together for purposes of class treatment—who paid any amount of money for Zantac that was manufactured, distributed, or sold by any Defendants.

**A.      Federal Rule of Civil Procedure 23(a)**

118.    Federal Rule of Civil Procedure 23(a) provides for class certification where the representative plaintiff demonstrates that:

> 1.    the class is so numerous that joinder of all members is impracticable;
>
> 2.    there are questions of law or fact common to the class;
>
> 3.    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> 4.    the representative parties will fairly and adequately protect the interests of the class.

**(1)    *Numerosity***

119.    On information and belief, the Class includes hundreds of third-party payers throughout the United States, such that individual joinder of each Class member is impracticable.

**(2)    *Commonality***

120.    Plaintiff and the Class Members assert claims that raise common questions of law and fact.

121.    Some of the common questions of law and fact include:

(a)    Whether the Defendants knew or had reason to know that Zantac formed NDMA when ingested by consumers;

(b)     Whether the Defendants engaged in fraudulent and deceptive conduct by

manufacturing, selling, and marketing Zantac;

(c)     Whether the Defendants engaged in a pattern and practice of selling Zantac;

(d)     Whether the Defendants constitute an enterprise within the meaning of 18 U.S.C.

§ 1961(4);

(e)     Whether the Defendants have committed acts of mail and wire fraud;

(f)     Whether the Defendants engaged in a pattern of racketeering activity;

(g)     Whether the Defendants have used or invested income from their racketeering

activities to establish an enterprise in violation of 18 U.S.C. § 1962(a);

(h)     Whether the Defendants have conducted or participated in the affairs of an

enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c);

(i)     Whether the Defendants have been unjustly enriched;

(j)     Whether the Defendants breached express and implied warranties;

(k)     Whether the Defendants violated state consumer protection statutes;

122.    The common questions identified above predominate over questions, if any, that

may affect only individual Class Members.

123.    The Defendants subjected Plaintiff and the Class Members to the same harm and

did so in the same manner.

### (3)     *Typicality*

124.    Plaintiff's claims are typical of the claims of Class Members because they are

based on the same legal theory, arise from the similarity, uniformity, and common purpose of

Defendants' unlawful conduct, and are not subject to any unique defenses. Members of the Class

44

have sustained damages in the same manner as Plaintiff, as a result of Defendants' wrongful conduct.

125.    Plaintiff's claims are typical because the Defendants, through their misrepresentations and omissions, caused Plaintiff and the Class Members to pay for contaminated, dangerous Zantac for which Plaintiff and the Class never should have had to pay. Plaintiff's claims also are typical because the Defendants deceived Plaintiff and the Class Members in exactly the same way, through knowing, reckless or negligent misrepresentations, as well as express and implied warranties, that Zantac was safe, and was merchantable and fit for its intended purpose when, in fact, it was not.

### (4)    *Adequacy of Representation*

126.    Plaintiff and its attorneys will fairly and adequately protect and represent the interests of the Class. Plaintiff is a member of the Class defined above, is committed to the active and vigorous prosecution of this action, and has retained competent counsel experienced in litigation of this nature.

127.    There is no antagonism or hostility of interests between Plaintiff and the Class and there will be no difficulty in the management of this litigation as a class action.

### B.    Federal Rule of Civil Procedure 23(b)

128.    Questions of fact or law common to Plaintiff's and the Class Members' claims predominate over any questions of law or fact affecting only individual Class Members. All claims by Plaintiff and Class Members arise from the Defendants' common course of unlawful conduct. The predominating questions of law and fact include those set forth above in Paragraph 121.

129.     Common issues predominate where, as here, liability can be determined on a class-wide basis, even if there might be the need for some individualized damages determinations. As a result, in determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

130.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation because a class action is the most manageable and efficient way to resolve the individual claims of each Class Member.

131.     Specifically, a class action is the superior method of adjudicating Plaintiff's and the Class Members' claims because it will provide Class Members with what may be their only economically viable remedy. Moreover, there are no known Class Members who are interested in individually controlling the prosecution of separate actions. In addition, a class action will concentrate all litigation in one forum, which will conserve judicial and party resources with no unusual manageability problems, because issues regarding the Defendants' liability and the nature of Class Members' damages will be determined by class-wide proof, while the amounts of Class Members' damages will be determined by class-wide methods of data processing and computation.

## **TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

132.     Within the periods of any applicable statutes of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that high levels of the carcinogen NDMA were produced by Zantac ingestion.

133.     Plaintiff could not have reasonably discovered the true extent of Defendants'
deception about Zantac's safety until Valisure filed its Citizen Petition disclosing the extremely
high levels of NDMA produced by Zantac.

134.     Moreover, all applicable statutes of limitation have also been tolled by
Defendants' fraudulent concealment throughout the period relevant to this action of Zantac's
producing high levels of the carcinogen NDMA.

135.     Instead of disclosing to third-party payers the link between Zantac and the
carcinogen NDMA, Defendants continued to manufacture and sell Zantac without disclosing this
information on the drug's label or elsewhere. Further, Defendants misled the public into
believing Zantac was safe by repeatedly touting its safety. Indeed, until the day it issued its
recall, Defendant Sanofi still claimed that "longstanding science supports the safety of
Zantac."[104]

136.     The continuing tort doctrine applies when there is a repeated or continuous injury
and the tort is not completed until the last injury is inflicted or the wrongdoing ceases. In cases of
continuing torts, the statutes of limitation do not begin to run until the date of the last tortious act.

137.     The Plaintiff's assignors paid for Zantac on behalf of their beneficiaries. Each
time Plaintiff's assignors paid for Zantac, it constituted a continuing tort.

138.     The time period associated with the Plaintiff's statute of limitations did not begin
to run until, at the earliest, the Plaintiff's assignors' last purchase of Zantac.

---

[104] https://www.zantacotc.com  (last accessed Nov. 11, 2019).

## CAUSES OF ACTION

### COUNT I
**Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964**
**(Against all Defendants)**

139.    Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

140.    Plaintiff asserts a cause of action under 18 U.S.C. § 1964(c) on behalf of itself and all similarly-situated healthcare insurers.

141.    The Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the enterprise (as described more fully below) through a pattern of racketeering activity.

142.    Plaintiff and the Class Members are "persons" within the meaning of 18 U.S.C. § 1961(3), and each is a "person injured in his or her business or property" by reason of the Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

**A.     The Enterprise**

143.    The Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

144.    These persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of 18 U.S.C. § 1962(c), and will be referred to herein collectively as the Enterprise.

145.    The Enterprise, which engaged in and whose activities affected, interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4), and consists of "persons" associated together for a common purpose.

146.    The purpose of that Enterprise was to maximize their profits and sell as much Zantac as possible.

147.    The Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. Each participant engaged in numerous acts of racketeering, specifically wire and mail fraud, designed to further the Enterprise.

148.    Importantly, the Enterprise had an existence that was separate and distinct from the pattern of racketeering in which the Defendants engaged. Whereas the Enterprise consisted of selling and marketing Zantac and ranitidine, the pattern of racketeering activity focused on concealing the fact that ranitidine was carcinogenic and produce high levels of NDMA in the human body.

149.    The Defendants conspired with each other with each other to minimize the impact of other studies, which suggested that Zantac inherently produced NDMA when ingested. The Defendants continued to market Zantac as safe despite knowing or having reason to know that Zantac was not safe for consumption.

150.    At all relevant times, the Defendants operated, controlled or managed the Enterprise, through a variety of actions. First, Glaxo worked with Hoffman-La Roche to market Zantac's safety while disregarding the risk that it could break down into a cancer-causing substance. Glaxo and Hoffman-La Roche's efforts were so successful that they catapulted Zantac into the position of most widely-prescribed drug in the world. Then, as Zantac's patent was set to expire, Glaxo teamed up with Pfizer (Warner-Lambert) and obtained and licensed the right to sell Zantac over the counter, where it remained one of the top over-the-counter drugs until the recent recalls. Glaxo entered into various licensing arrangements with Pfizer, Boehringer, and Sanofi to continue manufacturing Zantac and marketing the drug as safe, when in fact it was not safe.

151.    The Defendants' participation in the Enterprise was necessary for the successful operation of its scheme. The members of the Enterprise all served a common purpose: to sell as much Zantac as possible, thereby maximizing the revenue and profitability of the Enterprises' members. The members of the Enterprise shared the bounty generated by the enterprise, that is, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Enterprise benefited from the common purpose: the Defendants sold more Zantac than they would have otherwise had the NDMA contamination been known.

**B.    The Predicate Acts**

152.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below the Defendants and the members of the Enterprise have committed acts of mail and wire fraud in furtherance of the scheme.

153.    Defendants committed hundreds of thousands of acts of racketeering each time they manufactured and sold Zantac representing that the drug was safe for its intended use. The Defendants knew that each time they made these representations that they were false. Thus, the Defendants utilized the mail and wires with the intent to commit fraud.

154.    These representations were false because Defendants knew of the many studies which concluded that the ranitidine in Zantac produced NDMA when ingested. Defendants minimized these studies by relying on flawed studies funded by Glaxo and others controlled by Glaxo or other Defendants. Despite knowledge of these facts, Defendants marketed Zantac as safe, completely ignoring and failing to disclose the inherent health risks of ingesting Zantac. Instead, Defendants knowingly sold massive quantities of inherently toxic and carcinogenic Zantac, while at the same time falsely representing that Zantac was safe.

155.     Based on these affirmative misrepresentations and omissions, healthcare providers prescribed Zantac to patients based on Defendants' false and inaccurate representations that it was safe. Defendants' misrepresentations and omissions were material to the healthcare providers' decisions to prescribe their patients Zantac. If providers had known that Zantac was inherently and unreasonably dangerous because of the NDMA it contains and produces in the body, they would not have prescribed it to their patients. Indeed, due to the levels of NDMA produced by Zantac consumption, the drug would not have been permitted to be sold in the United States—a point made clear by the recall of the drug.

156.     Pharmacies sold the inherently defective Zantac, which produced NDMA, to patients that were prescribed Zantac by their healthcare providers. Pharmacies filled prescriptions for Zantac based on the Defendants' false and inaccurate representations that the drug was safe. The Defendants' misrepresentations and omissions were material to the pharmacies' decisions to fill prescriptions for Zantac. If the pharmacies had known that Zantac was not safe and produced NDMA when ingested, they would not have filled those prescriptions. In fact, since the FDA's notice alerted the public to NDMA impurities in Zantac, pharmacies across the country have pulled Zantac off the shelves and have been assisting patients in finding suitable Zantac alternatives. Those prescriptions were completely or partially paid by healthcare insurers, which include Plaintiff's assignors and the Class Members.

157.     Healthcare insurers were primary victims of Defendants' unlawful scheme. These healthcare insurers were the principal payers for the prescription Zantac. Defendants, directly or indirectly, induced healthcare insurers (including Plaintiff's assignors) and other employees to authorize the inclusion of Zantac into the insurers' "formularies" (lists of drugs covered by healthcare policies), by misrepresenting that Zantac was safe for its ordinary, intended use. The

Defendants' misrepresentations and omissions were material to the decisions by Plaintiff's assignors and the Class Members to include Zantac in their formularies. If insurers had known that Zantac would produce NDMA when consumed, they would not have included it on their formularies, nor made any payments for Zantac.

158.    As part of this scheme, Defendants used, and caused others to use, the United States mail and interstate wires, including by sending claims and making or receiving payments for Zantac. In this way, the Defendants conducted or participated, directly or indirectly, in the conduct of Plaintiff's assignor's affairs through a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(5).

159.    By reason of and as a result of the conduct of the Defendants, and in particular, their pattern of racketeering activity, Plaintiff and the Class Members have been injured in their business or property by paying (either completely or partially) for Zantac.

160.    The Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and the Class Members, and Plaintiff and the Class Members have a right to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

## <u>COUNT II</u>
### Breach of Express Warranty
### (Against all Defendants)

161.    Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

162.    Each Defendant expressly represented and warranted that their Zantac was safe in accordance with its new drug applications and FDA approvals. By putting their Zantac into the stream of commerce, each Defendant also expressly warranted that its Zantac conformed to its

new drug application, which did not list NDMA or its health risks. Thus, the Defendants expressly warranted that their Zantac was safe.

163.    Zantac did not conform to the Defendants' express representations and warranties, because the drug was not safe because it inherently produced NDMA, a cancer-causing chemical, when used according to its label.

164.    At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313;  Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313;  N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26;  Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, *et seq.*; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A-2-313; Va. Code § 8.2-313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313

165.     At the time that each Defendant marketed and sold Zantac, it knew the purposes for which the drug would be used, and expressly warranted that it was safe and did not produce NDMA when ingested. These representations and warranties became part of the basis of the bargain in Plaintiff's assignors' and Class Members' decisions to include Zantac in their formularies.

166.     Each Defendant breached its express warranties with respect to its Zantac because Zantac was not safe and was, in fact, dangerous to consume because it produced dangerous levels of NDMA when ingested according to its label.

167.     The Defendants' breach of their express warranties were the direct and proximate cause of the Plaintiff's and Class Member's damages.

168.     Plaintiff's, and the Class Members', damages include all payments for Defendants' Zantac.

<u>**COUNT III**</u>
**Breach of Implied Warranties of Merchantability and Fitness,**
**(Against all Defendants)**

169.     Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

170.     At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose: Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. Ann. § 47-2314; Ark. Code. Ann. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. Stat. § 4-2-314; Conn. Gen. Stat. Ann. § 42a-2-314; 6 Del. Code. § 2-314; D.C. Code. § 28:2-314; Fla. Stat. Ann. § 672.314; Ga. Code. Ann. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Kan. Stat. Ann. § 84-2-314; Ky. Rev. Stat. Ann. § 355.2-314; La. Civ. Code Ann. Art. § 2520; 11 Me. Rev.

Stat. Ann. § 2-314; Md. Code. Ann. § 2-314; Mass. Gen. Law Ch. 106 § 2-314; Mich. Comp. Laws Ann. § 440.2314; Minn. Stat. Ann. § 336.2-314; Miss. Code Ann. § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code Ann. § 30-2-314; Nev. Rev. Stat. U.C.C. § 104.2314; N.H. Rev. Ann. § 382-A:2-314; N.J. Stat. Ann. § 12A:2-314; N.M. Stat. Ann. § 55-2-314; N.Y. U.C.C. Law § 2-314; N.C. Gen. Stat. Ann. § 25-2-314; N.D. Stat. § 41-02-314; Ohio Rev. Code Ann. § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa. C.S. § 2314; P.R. Laws. Ann. Tit. 31, § 3841, *et seq*.; R.I. Gen. Laws § 6A-2-314; S.C. Code Ann. § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code Ann. § 47-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Utah Code Ann. § 70A-2-314; Va. Code § 8.2-314; Vt. Stat. Ann. 9A § 2-314; W. Va. Code § 46-2-314; Wash. Rev. Code § 62A 2-314; Wis. Stat. Ann. § 402.314 and Wyo. Stat. § 34.1-2-314.

171.    Defendants all are "merchants" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

172.    Zantac is and was a "good" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

173.    The Defendants were obligated to provide Plaintiff and Class Members with Zantac that was of merchantable quality, was reasonably fit for the purpose for which it was sold and conformed to the standards of the trade in which Defendants are involved, such that their Zantac was of fit and merchantable quality.

174.    The Defendants knew or had reason to know that their Zantac was being manufactured and sold for the intended purpose of human consumption as a safe treatment for stomach ailments, and impliedly warranted that Zantac was of merchantable quality and fit for that purpose.

175.    The Defendants breached their implied warranties, because their Zantac was not of merchantable quality, nor fit for its ordinary purpose, and was not safe when used as directed.

176.    Defendant's breaches of implied warranties were a direct and proximate cause of Plaintiff's and the Class Members' damages.

177.    Plaintiff's, and the Class Members', damages include the payments for Defendants' Zantac, which was not of merchantable quality, was not fit for its ordinary purpose, was not safe, and was so unmerchantable and unfit for their ordinary use as to have zero market value.

## COUNT IV
### Fraud / Negligent Misrepresentation
### (Against all Defendants)

178.    Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

179.    Defendants made, or caused to be made, false and fraudulent representations of material facts, and failed to disclose material facts to Plaintiff's assignors and all Class Members, with regard to Defendants' Zantac.

180.    Defendants affirmatively misrepresented material facts, including the material misrepresentations that their Zantac was safe and did not contain or produce NDMA when ingested as directed.

181.    Defendants failed to disclose the material facts that their Zantac were not safe and, in fact, produce significant levels of cancer-causing NDMA when ingested.

182.    Defendants' misrepresentations fraudulently induced Plaintiff's assignors and Class Members to include the Defendants' Zantac in their formularies, which were used as the basis for causing them to pay for Zantac. Defendants knew, had reason to know, or should have known that Zantac was not safe and produced NDMA when ingested. Plaintiff's assignors and

the Class Members would not have paid any amounts of money for Defendants' Zantac if they had known the truth.

183.    Defendants knew, had reason to know, recklessly disregarded, or should have known, that their safety representations were materially false or misleading, or that their failure to disclose material facts rendered those representations false or misleading.

184.    Defendants also knew, had reason to know, recklessly disregarded, or should have known, that their material misrepresentations and omissions would induce Plaintiff's assignors and the Class Members to pay some or all of the cost of Defendants' Zantac.

185.    Defendants' misrepresentations and omissions were material.

186.    Defendants made their misrepresentations and omissions with the intent to induce Plaintiff's assignors and the Class Members to pay for Defendants' Zantac.

187.    But for Defendants' misrepresentations and omissions, Plaintiff's assignors and the Class Members would not have paid for Defendants' Zantac.

188.    Plaintiff's assignors and the Class Members reasonably relied on Defendants' material misrepresentations and omissions. Defendants' identical or substantially identical misrepresentations and omissions were communicated to Plaintiff's assignors and each Class Member through product labeling, marketing materials, and other public statements by Defendants. But for Defendants' unlawful conduct, neither Plaintiff's assignors nor the Class Members would have included Defendants' Zantac in their formularies, nor paid any amount of money for Zantac.

189.    Plaintiff and the Class Members have been damaged by Defendants' misrepresentations and omissions as alleged herein.

## COUNT V
### Violations of State Consumer Protection Laws
### (Against all Defendants)

190.  Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

191.  Each Defendant has violated the consumer protection statutes as follows:

a.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*;

b.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

c.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arizona Rev. Stat. § 44-1522, *et seq.*;

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

e.  Defendants have violated the California Unfair Competition Law by engaging in unfair or deceptive acts or practices in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

h.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

i.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. State 10-1-392, *et seq.*;

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation 815 ILCS 505/1, *et seq.*;

o.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code Ann. § 714H, *et seq.*;

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*;

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*; Defendants have engaged in unfair competition or unfair or deceptive acts or practices

in violation of Md. Com. Law Code § 13-101, *et seq.*;

u.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

v.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

w.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

x.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, *et seq.*;

y.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.0 10, *et seq.*;

z.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

aa.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

bb.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

cc.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

dd.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

ee.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

ff.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

ii.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

jj.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

kk.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

ll.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

mm.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*;

nn.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

oo.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

pp.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

qq.     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

rr.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*;

ss.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*;

tt.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

uu.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*; Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

vv.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*;

ww.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*; and

xx.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 23 L.P.R.A. § 1001, *et seq.*, the applicable statute for the Commonwealth of Puerto Rico.

192.    To the extent applicable, each Defendant intended, knew, had reason to know, recklessly disregarded, or should have known that its fraudulent and deceptive acts, omissions, or concealment would induce reliance, or reliance can be presumed in the circumstances. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive

acts or practices, Plaintiffs and other Class Members have suffered damages—ascertainable losses—in an amount to be proved at trial.

## COUNT VI
### Unjust Enrichment
### (Against all Defendants)

193.    Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

194.    Plaintiff's assignors and Class Members conferred a benefit on defendants by promptly paying for the Zantac they purchased.

195.    At all material times, all Defendants were aware of the benefit conferred by Plaintiff's assignors and the Class Members.

196.    Defendants knowingly and voluntarily accepted payments from Plaintiff's assignors and the Class Members for Zantac, which the Defendants fraudulently represented as safe when used as directed.

197.    It would be unjust and inequitable for the Defendants to retain the monies that Plaintiff's assignors and the Class Members paid for Zantac, which was worthless because of its inherent defects.

198.    Principles of law and equity require that Defendants disgorge the monies paid for Zantac by Plaintiff's assignors and Class Members, and make restitution of those amounts to Plaintiff and Class Members.

## COUNT VII
### Disgorgement and Restitution of the Proceeds
### of Illegal Contracts
### (Against all Defendants)

199.    Plaintiff incorporates by reference paragraphs 1 to 138 of this Complaint.

200.    The Defendants sold Zantac to Plaintiff's assignors and Class Members.

201.    Defendants could not lawfully sell Zantac because it was not safe for its intended use due to an inherent defect, namely, the toxicity and cancer risk of NDMA.

202.    Defendants knew or had reason to know that Zantac could not lawfully be sold.

203.    Every purchase agreement by which Plaintiff's assignors and the Class Members purchased and paid for Zantac was an illegal contract.

204.    Plaintiff's assignors and the Class Members were unaware that Zantac could not lawfully be sold.

205.    Because Plaintiff's assignors and the Class Members were innocent of Defendants' unlawful conduct that resulted in their paying for Zantac pursuant to illegal contracts, they have the right to recover the monies they innocently paid to the wrongdoing Defendants, and Defendants are required to disgorge those monies and make restitution in accordance with principles of equity and substantial justice

## JURY TRIAL DEMAND

206.    Plaintiff demands a trial by jury on all of the issues raised in this complaint.

## PRAYER FOR RELIEF

207.    WHEREFORE, Plaintiff, individually and on behalf of the Class Members; pray for the following relief:

      a.    a finding that this action satisfies the prerequisites for maintenance of a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), and certify the Class;

      b.    designation of Plaintiff as representative for the Class and Plaintiff's undersigned counsel as Class Counsel for the Class; and

      c.    a judgment against Defendants that:

          i.    grants Plaintiff and the Class Members treble damages for those moneys the Class is entitled to under 18 U.S.C. § 1964(c);

          ii.    grants Plaintiff and the Class Members damages for those moneys

the Class is entitled to under their direct right of recovery for breach of express and implied warranties, common law fraud, violations of FDUTPA, unjust enrichment, and restitution, and

iii.    grants Plaintiff and the Class Members such other and further relief as the Court deems just and proper under the circumstances.

Dated: November 11, 2019.

**RIVERO MESTRE LLP**

*Counsel for Plaintiff and the Class*
2525 Ponce de León Blvd., Suite 1000
Miami, Florida 33134
Telephone:  (305) 445-2500
Facsimile:  (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: jmestre@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: cwhorton@riveromestre.com
E-mail: ddaponte@riveromestre.com
Secondary: npuentes@riveromestre.com

By:    /s/ Andrés Rivero
        ANDRÉS RIVERO
        Florida Bar No. 613819
        JORGE A. MESTRE
        Florida Bar No. 088145
        ALAN H. ROLNICK
        Florida Bar No. 715085
        CHARLES E. WHORTON
        Florida Bar No. 46894
        DAVID L. DAPONTE
        Florida Bar No. 1002724